## N. Y. SUPERIOR COURT.

FRANK JOHNSON *et al.*, plaintiffs and respondents, agt. CHARLES J. OPPENHEIM *et al.*, defendants and appellants.

A *covenant for quiet enjoyment* in a *lease* means only that the tenant shall not be evicted by a paramount title. It relates only to the title, and not to the actual possession or undisturbed enjoyment, where there is no eviction from the premises demised.

So long as the tenant remains in possession and use of a part of the building, it is conclusive evidence against him that it has not been destroyed and that it is not untenantable within the meaning of the act of 1860.

It must be taken to have been the true intention of the legislature in the passage of the act of 1860, to absolve the lessee, in the cases contemplated by the statute, from the payment of rent, provided he avails himself of the privilege given to *quit and surrender possession* of the leasehold premises and of the land so leased or occupied.

It is *no surrender* in law or in fact, of leasehold premises by a tenant in possession claiming that the premises have become untenantable, and his right to abandon under the act of 1860, where he moves out on a previous notice to the landlord, and delivers to him the key of the main building, (which is refused) but leaves a sub-tenant of the lessee of a portion of the building, in undisturbed possession of his portion with a key to another outer door of the same, also in his possession. The possession of the sub-tenant is that of the tenant as respects the rights of the landlord under the statute.

*General Term, March,* 1872.

*Before* FREEDMAN, CURTIS *and* SEDGWICK, *JJ.*

APPEAL from judgment entered upon the verdict of a jury, and from order denying defendants' motion for a new trial upon the judge's minutes.

The action was brought to recover $3,500, a quarter's rent, due November 1st, 1869, of the premises, with the buildings thereon, known as No. 475 Broadway, running through to Mercer street, under a lease of the premises made by the plaintiffs, the owners, to the defendants, dated January 15th, 1869, for five years from May 1st, 1869, at the annual rent of $14,000, payable quarterly.

The lease contains the usual covenant on the part of the defendants, as lessees, to pay the rent, and a covenant on the part of the plaintiffs, that the defendants, on paying the said rent reserved, and fulfilling all the covenants and agreements on their part, shall, during the term granted enjoy and quietly hold said demised premises, without let or hindrance of the plaintiffs, their successors, heirs or assigns, or any other person whatever. It also contains the following provision :

" And the premises hereby demised are to be used in the business of importers and manufacturers of and dealers in cloaks and mantillas, and for any other purposes or business not more hazardous, as respects fire, than the business aforesaid, but for no other business, without written permission first had of the said party of the first part," &c.

The defendants, by their answer, admitting the lease, and their entry and occupation of the premises thereunder down to October 1st, 1869; set up for defense :

*Frst.* That on the 1st of October, the premises having become untenantable, without fault on their part, they surrendered possession, the principal cause of the injury to the premises having been the improvements on the adjoining property, against which the answer alleges that the plaintiffs did not provide proper or requisite precautions.

*Second.* That by the improvement of the adjoining premises, certain windows in the north gable wall of the building leased, which were useful and important for the purposes of their business, were closed, and that they surrendered on that account.

*Third.* The defendants admit their liability for the rent down to October 1st, 1869, the date of their alleged surrender, $2,333 34, and offer judgment for that amount.

The court having awarded the opening, and close to the defendants, they gave evidence tending to show that about the 1st of June, 1869, Mr. William C. Rhinelander, the owner of the lot adjoining on the north, tore down the old building standing on his lot, and proceeded to excavate the

same for the purpose of erecting a new building thereon, but that by reason of the defendants' refusal to give the necessary license, the building leased·was not properly shored up ; that as the excavation proceeded, the foundation of the north wall of the building gave way in part, and the wall itself and the lower floors of the building were consequently weakened and impaired solely in consequence of the building not being shored up ; that on the 24th day of August, a portion of the ground floor settled a foot or two, and the stairway to the second floor, the ceilings, &c., were more or less disturbed. On that day the defendants wrote to the plaintiffs, that by reason of the settling down of the floor the premises had become untenantable, and that they should, therefore, be compelled speedily to vacate the premises, and asking with whom and where they should leave the key. The plaintiffs replied, that they should decline to receive the key. The defendants continued to occupy the store, being more or less incommoded by the results of the excavation, until October 1st, and meantime, the erection of the new building adjoining closed up the windows on the north gable. On the 30th of September, the defendants having moved out their stock of goods, &c., sent the key of the front door of the store on Broadway, by express, to the plaintiffs, and wrote them by mail to that effect, stating that they had vacated the premises in consequence of the same having become untenantable. The defendants refused to receive the key, and replied by mail, October 2d, that they wholly refused to accept any surrender of the premises, or to accept the key, and would hold the defendants liable for all rent to accrue under the lease, and denying that the premises had been rendered untenantable, but that if they had, it was solely occasioned by the defendants' persistent refusal to allow the property to be shored up and protected against the adjoining excavation.

There was no pretense of any other surrender or attempt at surrender of the premises on the part of defendants, than this of October 1st.

Between the date of the execution of the lease and of the commencement of the term, the defendant executed to one Fisher, a manufacturer, a written lease of the entire fourth floor of the building and of a portion of the third floor for the entire period of the defendants' term under the lease. Under this lease Fisher entered into possession in May, 1869, of the portion of the premises so leased to him, and continued so to occupy the same and to carry on his business therein, until after the expiration of the quarter for the rent of which this action is brought. When the defendants quitted their part of the building and sent the key of the store to the plaintiffs, they left him in possession of the third and fourth floors, and took no proceedings whatever to remove him. It appears also, that the key which the defendant sent by express was only the key of the store; that the entrance to the lofts occupied by Fisher, was by a separate outer door and stairway on Broadway, to which there was another and different key, and that no offer of this key was made to the plaintiffs. The defendants offered to prove that Fisher had agreed to go out when they did, and they only received rent from him up to the time they left; but this evidence was excluded as immaterial. Upon this state of facts, the defendants having rested, the plaintiffs moved the court to direct a verdict in their favor for the whole quarter's rent, insisting that the defendants had proved no surrender, and the court so ordered, and the defendants excepted. Defendants' counsel submitted a series of requests to charge the jury, but the court refused to charge any of them, and defendants' counsel excepted to each refusal separately.

The jury, by direction of the court, found a verdict for the plaintiffs for $3,985 10.

The defendants' counsel then moved for a new trial on the minutes of the judge, upon the legal exceptions taken in the course of the trial; on the exceptions taken to the refusal of the court to charge as requested by the defendants; on the exceptions taken to the charge of the court as delivered,

and also upon the ground of insufficient evidence to warrant the direction of the court to the jury to render such a verdict, or to warrant the jury in rendering such a verdict.

The motion was denied by the court, and to the decision of the court in that behalf, and each and every part of it the defendants' counsel then and there duly excepted.

Judgment was thereafter entered upon the verdict, and defendants appealed from the judgment, and also from the order denying the motion for a new trial.

JOHN GRAHAM, *for defendants and appellants.*
JOSEPH H. CHOATE, *for plaintiffs and respondents.*

*By the court,* FREEDMAN, *J.*—The covenant for quiet enjoyment contained in the lease means only that the tenants shall not be evicted by a paramount title. It relates only to the title, and not to the actual possession or undisturbed enjoyment, where there is no eviction from the premises demised.

Nor is there any actual or implied contract or warranty on the part of the plaintiffs in this case, that the premises demised shall be or continue fit for the purposes of defendants' business. The clause contained in the lease, which requires the premises to be used in the business of importers and manufacturers of and dealers in cloaks and mantillas, or for any business not more hazardous, as respects fire, than the business specifically mentioned, cannot be construed into any such implied contract or warranty (*Howard* agt. *Doolittle,* 3 *Duer,* 464; *Doupe* agt. *Genin,* 1 *Sweeny,* 29; *affirmed,* 45 *N. Y.,* 119).

*Myers* agt. *Burns,* 35 *N. Y.,* 269, is not an authority for the proposition that it should be so construed. In the last mentioned case, the landlord had leased the premises "as a first class hotel," and had covenanted "to keep the said hotel and premises in good necessary repair during the term, at his own proper charge and expenses."

To defeat plaintiffs' action, therefore, defendants had either to prove an eviction, or to bring themselves within the provisions of the act of 1860, and before the verdict rendered against them, pursuant to the direction of the court, can be upheld, it must appear clearly, that they failed to do either. The defendants had the affirmative of the issue. There being no conflict of evidence, when they rested their proofs, all presumptions and inferences which they would have had a right to ask the jury to draw in their favor from the facts proven, if the case had been submitted to the jury, are to be conceded to them.

The adjudications of this state, bearing upon the general subject of interference by landlords with tenants, may be assorted into three distinct and entirely different classes of cases, the remedy for each class being peculiar to it, viz.:

*1st.* Cases where the tenant is evicted, without the wilful or voluntary agency of the landlord, from the whole or some part of the demised premises; as for example, an eviction of the tenant by title paramount of the contiguous proprietor. Here, if the eviction is from the whole premises, the tenant is not chargeable with rent; but if it be from a part of the premises, the law, in its inability to impute blame to the landlord for the act of another person, requires the rent to be apportioned, so that the tenant shall be liable to pay for such portions of the premises as he retains (*Moffat* agt. *Strong*, 9 *Bosw.*, 57; and see *Mark* agt. *Patchin*, 29 *How.*, 20).

*2d.* Cases where the landlord commits an act or acts of trespass, which interfere, more or less, with the beneficial enjoyment of the premises, but which leave the demised premises intact, and do not deprive the tenant of any part of them, so that, though he may be injured, he is not, thereby dispossessed. Here the rule is, inasmuch as the wrongful act of the landlord stops short of depriving the tenant of any portion of the premises, that such trespass is no defense against the liability for rent, and the tenants' sole remedy therefor is an action for damages against the wrongdoer

(*Edgerton* agt. *Paige,* 20 *N. Y.,* 283 ; *Lounsberry* agt. *Snyder,* 31 *N. Y.,* 514 ; *Cram* agt. *Prosser,* 2 *Sandf.,* 120 ; *Mortimer* agt. *Bruno,* 6 *Bosw.,* 653 ; *Peck* agt. *Hiler,* 31 *Barb.,* 117).

3*d.* Cases where the landlord enters wilfully upon and expels the tenant, actually or constructively, from a part of the demised premises. Here the rule is, that the whole rent is suspended during the term, though the tenant continue in possession of the residue (*Christopher* agt. *Austin,* 1 *Kern.,* 217; *Peck* agt. *Hiler,* 24 *Barb.,* 178).

No eviction, actual or constructive, within the decision of any of these cases has been proved in the case at bar. The right of William C. Rhinelander, the owner of the lot adjoining the premises in question on the north, so to improve and build upon his own lot, as to shut up the windows in the north wall of the premises demised to the defendants. there being no question of ancient lights, cannot be disputed, and as the lease contains no covenant against it, the closing up of said windows by Rhinelander cannot be tortured into an eviction, actual or constructive, of the defendants from the whole or any part of the demised premises. Even had the plaintiffs themselves owned Rhinelander's lot and built on such land in such a manner as to obstruct and darken the windows in the premises demised, such act, even if it were a ground for damages, would not have operated as an eviction (*Palmer* agt. *Wetmore,* 2 *Sandf.,* 316; *Parker* agt. *Foote,* 19 *Wend.,* 309; *Meyers* agt. *Gemmel,* 10 *Barb.,* 537).

Not having shown an eviction independently of the act of 1860, the next inquiry is, whether defendants have brought themselves within the provision and purview of that act.

Now it is true, that the literal reading of the statute is, that if a building, without any fault or neglect on the part of the lessee, be destroyed, or be so injured, as to be untenantable and unfit for occupancy, the lessee shall not be liable to pay rent after such destruction or injury, unless

otherwise expressly agreed, and may quit and surrender the possession. The defendants claim the benefit of such literal reading, and insist that the statute should be so construed as to mean that, whenever the demised premises become untenantable and unfit for occupancy, that constitutes an eviction of the lessee, suspending the right of the landlord to rent so long as it lasts, and that, in addition to this, the lessee may quit and surrender and thus absolutely annul the lease; that he has this option, but is not bound to exercise it. But as such literal interpretation would lead to the absurd consequence, in case of the destruction or unfitness of only a comparatively small part of the demised premises, of continuing the lessee in the enjoyment and occupation of the premises, and yet absolving him from all rent, it cannot be adopted. As laws must necessarily deal in generals, and cannot descend to particulars, and as the interpretation of them is the application of them to particular cases, and as the presumption is against an absurd intent, whenever the words taken in their ordinary sense would lead to such a consequence, it is the duty and province of the courts to so far restrict their meaning as to avoid such a consequence. *Domat* says upon the point : " Whenever it appears that the sense of a law, how clear soever it may appear in the words, would lead us to false consequences, and to decisions that would be unjust, if the law were indifferently applied to everything that is contained within the expression, the palpable injustice that would follow from this apparent sense, obliges us to discover by some kind of interpretation, not what the law says, but what it means, and to judge by its meaning, how far it ought to be extended, and what are the bounds that ought to be set to its sense." The interpretation here refered to is to be guided again by certain well established rules, and one of the most prominent of these, and one which helps us most in the discovery of the true meaning of the law, is the reason of the law, or the cause which moved the legislature to enact it. This ought not to

be confounded with the mind of the law ; for that is nothing but the genuine meaning of it, for the finding out of which we call in the reason of it to our assistance.

Another rule is, that in case of doubt, a statute consisting of divers parts or clauses is to be judged by looking at the whole, and to be construed so as to carry out the intention of the law-making power. The whole context may be considered in endeavoring to collect such intention, although the immediate object of the inquiry be the meaning of an isolated clause.

The reason and spirit of cases, therefore, make the law, and not the mere letter.

Now what was the reason for the passage of the statute in question, and the main intent of the legislature in enacting it?

At the time of such passage the law was firmly settled, by a long series of adjudications in the English courts as well as our own, that upon a lease for years, with a covenant to pay a stipulated annual rent, the rent is payable by a lessee to the end of his term, though the property be destroyed by fire, and that the lessee has no relief against an express covenant to pay the rent, either at law or in equity, unless he has protected himself by a stipulation in the lease, or the landlord has covenanted to rebuild. This rule operated so harshly in many cases that, as is well known, the legislature interfered by the passage of the act now under consideration. The act, in the absence of a written agreement or covenant to the contrary, reverses the prior rule of law and affords relief not only against fire, but against the elements generally and any other cause, by which the building may be so far injured as to be untenantable and unfit for occupancy. But it makes no apportionment or division of the building, or of its destruction, untenantableness or unfitness. Consequently, so long as the lessee remains in possession and use of a part of the building, it is conclusive evidence as against him that it has not been destroyed and that it is not untenantable or unfit for occupancy within the meaning of the act.

Johnson agt. Oppenheim.

In order to give due weight and effect to these various considerations, which have been noticed, it must be taken to have been the true intention of the legislature to absolve the lessee, in the cases contemplated by the statute, from the payment of rent, provided he avails himself of the privilege given to quit and surrender possession of the leasehold premises and of the land so leased or occupied. The reason and purpose of the law and the nature of the grievance it was designed to remedy forbid us, as the respondents have correctly argued, to construe the two clauses of the statute independently of each other, or to give the lessee the benefit of the relief from the rent except upon the condition of his quitting and surrendering the possession.

It remains, therefore, to be considered whether the defendants have quitted and surrendered such possession.

According to the evidence the defendants forwarded the key of the outer door to the store on the first story, to the plaintiffs by express, and at the same time, September 30, 1869, advised plaintiffs of it by letter through the post-office. Plaintiffs acknowledged the receipt of the letter under date of October 2, 1869, and absolutely refused to accept any surrender of the premises, or the key, upon the ground that the premises were not untenantable, and that, if they were, it was the fault of the defendants in consequence of their persistent refusal to allow the building to be protected against the consequences of the excavation on the adjoining lot. Plaintiffs also notified defendants that they, the defendants would be held liable for all rent to accrue under the lease. If the surrender was complete in fact and sufficient in law, the reasons assigned by plaintiffs for their refusal to accept it, are wholly immaterial. If incomplete and insufficient, defendants were not relieved by any of the grounds upon which plaintiffs based their refusal, or the manner of such refusal, from the necessity of making an effectual surrender. The evidence further showed, that the defendants had executed a written lease, for the whole unexpired term of their

own lease, to one Fisher, of the fourth and part of the third story of the building in question, that under this sub-lease Fisher had entered into possession and was engaged in the manufacture of tassels and fringes upon said premises and employed fifteen or twenty people in that business; that at the time of defendants' removal from the building they left Fisher behind in the occupation of the parts leased to him, and that he remained in the occupation and full enjoyment of those parts for a month or two after the first day of October, 1869. It also appeared that defendants took no proceedings whatever to remove Fisher; that the key sent by them by express was only the key of the store; that the entrance to the upper stories occupied by Fisher was by a separate outer door and stairway on Broadway, to which there was another and different key, and that no offer of this key was made to the plaintiffs. As Fisher's title was good against the plaintiffs and his continued occupation constituted, in judgment of law, possession by the defendants, the surrender, made by the latter of the key of the store, leaving Fisher in possession of the upper part of the building, was no surrender in law or in fact, of the possession of the leasehold premises and of the land covered by their lease, within the meaning of the act of 1860. The defendants, therefore, continued liable on their covenant to pay the rent.

As a necessary corollary, defendants' offer to prove that Fisher agreed to go out with the defendants, that pursuant to an arrangement made with him he had no longer any right to continue the occupation, and that they declined to receive rent from him after their own removal, were properly excluded as immaterial. No agreement, understanding, or dealings between them and Fisher could amount to a quitting and surrender of the possession, so long as Fisher remained actually in, and so long as his possession was their possession and not the plaintiffs'.

The views so far expressed render it unnecessary to inquire whether or not the defendants were precluded by their

refusal to allow the building to be shored up from invoking the benefit of the act of 1860.

The denial of defendants' motion, at the trial, for leave to amend the answer by the insertion of a defense of fraud by plaintiffs in the procurement of defendants' execution of the lease in question, was a matter not only resting in the sound discretion of the court, but perfectly proper under the circumstances. A motion for leave to set up a new and separate defense, and to raise an entirely new issue, the granting of which would operate as a surprise upon the plaintiffs, should never be allowed at the trial.

The judgment and order appealed from should be severally affirmed with costs.

Curtis and Sedgwick, *JJ.* concurred.